**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| CYNTHIA L. ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil No. 13-cv-951-JPG-CJP |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Cynthia L. Allen is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in August, 2008, alleging disability beginning on February 28, 2006.  (Tr. 14).   After an ALJ denied her application and the Appeals Council denied review, she sought judicial review in this Court.   The Commissioner agreed that the case should be remanded for further proceedings pursuant to sentence four of 42 U.S.C. §405(g).   See, *Allen v. Astrue*, Case No. 11-1100-CJP, Docs. 26-28.

After remand, ALJ Stuart T. Janney was assigned to the case.   After holding an evidentiary hearing, he denied the application for benefits in a decision dated July 9, 2013.   (Tr. 776-794).   The July 9, 2013, decision is the final decision of the Commissioner subject to judicial review.   Administrative remedies have been exhausted and a timely complaint was filed in this Court.

1

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1.      The ALJ created an "evidentiary deficit" by rejecting all of the medical opinions, and then relied upon his own independent medical determination to assess plaintiff's RFC.

2.      The ALJ erred in weighing the medical opinions.

3.      The ALJ did not properly assess plaintiff's symptoms.

4.      The ALJ's credibility analysis was erroneous.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).   For a DIB claim, a claimant must establish that she was disabled as of her date last insured.   *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th  Cir. 1984).  *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer

leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Ms. Allen was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## <u>The Decision of the ALJ</u>

ALJ Janney followed the five-step framework described above. He determined that Ms. Allen had not been engaged in substantial gainful activity from the alleged onset date of February

28, 2006, through her date last insured, March 31, 2010.  He found that plaintiff had severe impairments of cystocele, rectocele, bladder prolapse, and pelvic floor weakness; fibroid uterus status post total hysterectomy; episode of sepsis and respiratory failure; osteoarthritis of the hands; fibromyalgia syndrome; degenerative disc disease; level I obesity; and carpal tunnel syndrome. He further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found plaintiff had the residual functional capacity to perform work at the sedentary level, limited to frequent handling and fingering with the bilateral upper extremities. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past work. However, she was not disabled because she was able to do other work that exists in significant numbers in the regional and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

### 1.    Agency Forms

Plaintiff was born in 1964, and was 41 years old on the alleged onset date of February 28, 2006.  She was insured for DIB through March 31, 2010.   (Tr. 118).

In her initial Disability Report, plaintiff said she was unable to work because of a bladder prolapse and pelvic floor muscle disorder.   She said she stopped working on February 28, 2006, because she got pregnant and "the above conditions started."   (Tr. 122).

In September, 2008, Ms. Allen submitted a Function Report.   She lived with her husband and two sons.   One son was a teenager, and the second was two years old.   She said that she took

care of the two year old, and did some housework such as laundry, light cleaning and dusting. She made simple meals. She said that she had to go slowly, and could not lift anything over twenty pounds. Sitting for more than a half hour caused her back and pelvic muscles to cramp up. She had to go to the bathroom frequently. (Tr. 129-140).

Ms. Allen had worked as an in-store marketer in a retail store. She also sold advertising for print media and worked as an associate store manager in a retail store. (Tr. 142-149).

In December, 2008, plaintiff developed a kidney stone. She required emergency surgery, and went into septic shock. (Tr. 154). In February, 2009, she reported that she had difficulty with almost all physical activities, including sitting, standing, walking and reaching, because she had muscle spasms in her pelvic floor muscles (lower abdominals.) If she stood or walked for more than half an hour, her bladder dropped down, which caused pain and a need to urinate. She had little bladder control and leaked urine. She had to rest after climbing only a few stairs. Being in pain all the time made her depressed and irritable. Her memory was bad and she was easily distracted. (Tr. 168-170).

### 2.      Evidentiary Hearings

Ms. Allen was represented by counsel at both hearings. (Tr. 29, 804).

At the first hearing, on May 5, 2010, she testified that she had " a lot of problems" during her pregnancy in 2006, and that she "spent most of the pregnancy laying down." Her baby was born in August, 2006. She continued to have pain in her pelvic floor area after the baby was born. Because she had a history of cysts on her ovaries, her doctor did a total hysterectomy. However, she continued to have pain and abdominal cramping after the surgery. (Tr. 30-31).

In December, 2008, she developed a kidney stone which blocked her ureter.  She went into septic shock.  She was placed on a ventilator for six days.  When she was finally discharged from the hospital, she was weak and could barely walk 15 feet.  She testified that she was still weak and her right leg was not stable, so her doctor recommended a cane.  (Tr. 32).

Plaintiff testified that sitting more than 30 or 45 minutes caused her pelvic floor muscles and lower back to cramp up and her right leg became numb.  She could only walk for ½ block because of spasms in her right leg.  She had a lot of pain and swelling in her right knee.  (Tr. 35-36).

Her younger son was 3 and ½ years old.  He did not go to daycare.  Her 20 year old son, her husband and her neighbor helped her out with childcare and housework.     (Tr. 37-38).

The second hearing took place on June 17, 2013.  (Tr. 804).

Ms. Allen had health insurance through her husband's employment.  (Tr. 812).

She testified that she had been unable to work since 2006, when she was pregnant with her son.  She said that it was a "high risk pregnancy" and she had severe muscle spasms and cramping.  She spent the last 3 months lying down because she was in severe pain, and she "had become pretty much totally incontinent."  She had a hysterectomy, but continued to have pain. About a year after giving birth, she was diagnosed with a bladder prolapse.  (Tr. 812-814).  She was not a candidate for surgery because of scar tissue and her "chronic pain issues."  (Tr. 820).

Ms. Allen testified that, prior to her date last insured (March 31, 2010), she had daily pain and muscle cramping in her pelvic floor.  She had to lie down during the day to relieve the pain. She would start getting "crampy" after about a half hour of activity.  She learned exercises in physical therapy which helped a "little bit."  She had daily bladder incontinence.  She had both

7

stress incontinence and urgency to urinate.   She had weekly bowel incontinence.   (Tr. 821-825).

Plaintiff also testified that she had muscle spasms in her lower back and right leg.   She attributed this to the fact that her pelvic floor muscles had stopped functioning.   She had a lot of pain in her right thigh and her knee became unstable.   She also had pain "everywhere" because of fibromyalgia.   She felt like fibromyalgia "took over" after her hospitalization for septic shock.   Her pain did not get better, and she got to the point where she could hardly stand to be touched.   (Tr. 826-827).

Plaintiff began having pain in both hands, worse on the right, at some point.   A nerve conduction study showed moderate right median neuropathy in July, 2009.   A doctor recommended surgery, but said he could not guarantee that it would fix her problems, and, with her "scar tissue issues" it might make her worse.   (Tr. 836-837).

She was taking a number of medications around the time of her date last insured.   The pain medication made her sleepy if she took enough to eliminate her pain.   She took Elavil for depression, which helped her sleep.   She was very emotional and had daily crying spells.   She did not have therapy or counseling.   (Tr. 829-831).

A vocational expert (VE) also testified.   The ALJ asked her a series of hypothetical questions.   (Tr. 845-851).   One question corresponded to the ultimate RFC findings, that is, a person of plaintiff's age and work experience who was able to do work at the sedentary exertional level, limited to frequent (as opposed to occasional) handling and fingering with the dominant (right) upper extremity.[1]   The VE testified that this person could not do plaintiff's past work, but she could do other jobs such as surveillance system monitor, automatic machine tender, and

---

[1] The RFC finding limited *both* upper extremities to frequent use.   Plaintiff has not argued that this discrepancy makes any difference.

inspector.   (Tr. 848-850).

### 3.        Medical Treatment

Plaintiff was treated by Dr. Lisa Lasher, an OB/GYN, in 2006 and 2007.   She gave birth to a child in August, 2006.   The prenatal visits with Dr. Lasher were basically unremarkable, although cramping was noted on some visits.   On August 18, 2006, she was having irregular contractions and was instructed to decrease physical activity.   (Tr. 241-255).   She had a six week postpartum visit in October, 2006.   Dr. Lasher noted that there had been no complications of pregnancy or delivery.   The assessment was routine postpartum follow-up.   (Tr. 238-239).   In November, 2006, Dr. Lasher noted that plaintiff had been having dysfunctional bleeding; she diagnosed uterine fibroids and recommended that plaintiff undergo a total hysterectomy.   (Tr. 237-238).   One month after the surgery, in January, 2007, she was doing well and had no complaints about bowel or bladder functioning.   (Tr. 236).

The next visit with Dr. Lasher was in December, 2007.   Plaintiff was diagnosed with a cystocele.[2]   Ms. Allen did not want surgery, so Dr. Lasher recommended that she have a pessary inserted.[3]   (Tr. 232-235).

Dr. Stokes, a urologist, saw plaintiff for cystocele on January 28, 2008.   She denied any significant stress or urge urinary incontinence.   She also denied depression, joint pain and muscle aches.   She was referred to Dr. Walker for a possible cystocele repair.   (Tr. 383).   Dr. Walker

---

[2] A cystocele is also referred to as anterior prolapse or a prolapsed bladder.  It "occurs when the supportive tissue between a woman's bladder and vaginal wall weakens and stretches, allowing the bladder to bulge into the vagina."   http://www.mayoclinic.org/diseases-conditions/cystocele/ basics/definition/con-20026175, visited on July 2, 2015.
[3] "A vaginal pessary is a plastic or rubber ring inserted into [the] vagina to support the bladder." http://www.mayoclinic.org /diseases-conditions/cystocele/basics/treatment/con-20026175, visited on July 2, 2015.

9

inserted a pessary device, but she was unable to retain it.   (Tr. 385-387).

Dr. Fareesa Khan, a urogynecologist at Washington University School of Medicine in St. Louis, Missouri, saw plaintiff on August 14, 2008.   Plaintiff said that she had pelvic and abdominal pain since her hysterectomy.   She reported some stress incontinence, but better than when she had been pregnant.   She "rarely" leaked urine and reported no voiding or defecatory dysfunction.   Dr. Khan diagnosed stage 3 prolapse and pelvic floor dysfunction.   She recommended physical therapy to rehabilitate the pelvic floor musculature before surgery.   (Tr. 393-394).

In October, 2008, Dr. Adrian Feinerman performed a consultative physical examination. Plaintiff was 5 feet tall and weighed 172 pounds.   On exam, she had lower abdominal tenderness. Grip strength was strong and equal.   Fine and gross manipulations were normal.   Muscle strength was full throughout.   Range of motion was normal throughout.   (Tr. 411-418).

Ms. Allen received physical therapy at Southern Illinois Healthcare from August 20, 2008, to December 3, 2008.   She complained of pain in her right side and low back pain.   (Tr. 423-427).

On December 4, 2008, Ms. Allen was admitted to the hospital after developing sudden right flank pain along with nausea and vomiting.   Dr. Hark Chang diagnosed a proximal right ureteral stone.   He recommended a cystoscopy and placement of a ureteral stent followed by ESWL (Extracorporeal Shock Wave Lithotripsy).   (Tr. 456).   Following the cystoscopy and placement of the stent, she became septic and developed adult respiratory distress syndrome.   (Tr. 453-454).   She was discharged from the hospital on December 16, 2008.   (Tr. 429).

On December 22, 2008, Dr. Chang noted that she had "recovered from the sepsis" and she was "feeling fine."   The stent was still in place and the stone had displaced into her right kidney. He scheduled her for ESWL.  (Tr. 511).  Following ESWL, she was "doing fine" and had "passed many stone fragments.  She had some irritation from the retained stent.   He recommended removal of the stent.  (Tr. 510).

On January 6, 2009, a physician's assistant, Laura Law, noted that she felt shaky at times and sometimes felt "mentally cloudy."   Her energy level was improving but she was still very fatigued.  She was taking OxyContin for right flank and right abdominal pain.  She felt some depressed mood because of her situation, but felt she did not need any additional antidepressant medication.   She was instructed to follow-up with her urologist and to discontinue narcotic pain medications as soon as she was able to.   The note was co-signed by primary care physician Marci Moore-Connelley, M.D.   (Tr. 493-494).

Dr. Chang removed the stent on January 23, 2009.   (Tr. 518).

Plaintiff returned to Dr. Moore-Connelley's office on February 6, 2009.   She was again seen by PA Law.   She had not been back to physical therapy yet because of transportation issues. She was taking Relafen for pain, which helped "mildly."   She felt she was back to her baseline before the septic episode in December, 2008.   She was taking Elavil as needed for insomnia and felt her mood had improved.   She said she had been examined for her disability application, but felt the exam was not very thorough and she was "willing to have a Fit-for-Work" exam to assess her physical limitations.   The plan was to get a Fit-for-Work assessment and then fill out her lawyer's paperwork.   (Tr. 638-639).

Plaintiff was seen by PA Law on March 17, 2009, for continued chronic pelvic pain. Relafen was not helping her pain, and Elavil was not helping her insomnia. She also had the onset of bilateral anterior thigh and trapezius pain, and ongoing pain in her joints, including her fingers. On exam, her hair was falling out. She had no joint swelling and the range of motion of her joints was full. PA Law ordered lab work and referred her to the supervising physician due to the complexity of her problems. (Tr. 636-637).

Dr. Moore-Connelley saw her on March 31, 2009. She ordered additional testing and prescribed Lyrica as well as Elavil. (Tr. 634-635). She returned to Dr. Moore-Connelley in May, 2009, to have disability forms filled out. She said she had been prescribed Parafon Forte by a rheumatologist, which was helping. She could not afford Lyrica because the co-pay was $44.00. The exam was "significant only for generalized tenderness to palpation." Dr. Moore-Connelley told her she would not diagnose her with fibromyalgia because "she had numerous tender areas beyond just fibromyalgia points." The doctor wrote that she "spent over 20 minutes completing disability forms with [patient] present." (Tr. 630). In July, 2009, Dr. Moore-Connelley noted that plaintiff was resistant to taking Lyrica. She had been diagnosed with fibromyalgia by Dr. Bailey, a rheumatologist. She was taking a muscle relaxer, which was helping, and was sleeping better with Elavil. The assessment was that her pain was improved. (Tr. 628).

Dr. Bailey's records are at Tr. 600-607. He saw plaintiff in May and July, 2009. Dr. Bailey diagnosed "fibrositis." (Tr. 600). X-rays of plaintiff's hands showed grade 2 osteoarthritis in the D.I.P. joints of the index fingers and of the first carpal-metacarpal compartments. (Tr. 607).

12

In September, 2009, she was tearful and told Dr. Moore-Connelley that she had a setback. She had gotten worse after being sick and doing her son's birthday party.   She had been unable continue her medication as it was not covered by her insurance.   She had not started Cymbalta. (Tr. 625-626).   About 2 weeks later, she was doing better after having started Cymbalta.   (Tr. 624-625).   In October, 2009, Dr. Moore-Connelley again noted she was doing well on Cymbalta and her physical therapy was gradually increasing her stamina.   (Tr. 622-623).   However, in December, 2009, plaintiff reported that her fibromyalgia pain was no better, and might be worse. Cymbalta was not making much of a difference.   On exam, she appeared fatigued.   She had tender points, but no muscle weakness.   Dr. Moore-Connelley recommended that she try Lyrica. (Tr. 619-620).

Ms. Allen attended physical therapy to strengthen her pelvic floor muscles from February 16, 2009, through April 22, 2009.   (Tr. 550-557).   On April 20, 2009, she reported that, since increasing her Neurontin to 3 doses a day, she "cannot wake up and feels very weak."   She had not been able to increase her strength or functional activities at home.   The strength of her lower abdominals was rated as "trace."   (Tr. 550).

In June, 2009, a physician's assistant practicing with Dr. Terrence Glennon saw Ms. Allen for complaints of fatigue, muscle weakness and pain in her extremities.   Her symptoms had been present for more than 3 months.   She said she did not have time to exercise because of her 3 year old child.   On exam, she had "multiple and typical trigger tender areas in the lower extremities, back, upper extremities and neck."   The assessment was muscle weakness and fatigue, consistent with fibromyalgia.   The PA prescribed a nerve conduction study of the lower extremities, and started her on Savella. (Tr. 610-611).   She returned on July 27, 2009.   Savella helped, but she had

13

to pay a co-pay of $50.00 per month.  She was told to restart Elavil because she was having trouble sleeping.  She also complained of bilateral heel pain.  The assessment was fibromyalgia and plantar fasciitis.  (Tr. 608).

In July, 2009, EMG and nerve conduction studies showed moderate right median neuropathy at the wrist.  Clinical correlation for carpal tunnel syndrome was suggested.  The studies showed no median neuropathy at the left wrist, ulnar neuropathy at the right elbow, peripheral neuropathy, cervical radiculopathy or lumbosacral radiculopathy.  (Tr. 1407).

Plaintiff continued to see Dr. Moore-Connelley on a regular basis.  In January, 2010, plaintiff told the doctor that her medicine was not helping and her right knee swelled if she stood for more than an hour.  She needed to use a cane over the holidays for steadiness.  Savella had started to work, but it was not covered by her insurance.  The only objective finding was that plaintiff appeared "very fatigued."  The doctor asked the insurance company for prior approval for Savella.  (Tr. 1381-1383).  The insurance company approved Savella shortly thereafter.  (Tr. 1379).  On February 16, 2010, plaintiff reported that she was feeling better on Savella.  She had more energy and less muscle pain.  Dr. Moore-Connelly detected some mild weakness in the upper thighs and upper arms.  Deep tendon reflexes and sensation were normal.  (Tr. 1375-1376).

Dr. Alam, a neurologist, saw plaintiff in January, 2010.  Among her other symptoms, plaintiff reported tremors in her right hand.  She denied any gait difficulty.   Dr. Alam ordered an MRI of the brain, which was normal.   He continued her medications.   She reported that Savella helped her symptoms.  (Tr. 1263-1266).

Plaintiff was last insured for DIB on March 31, 2010.

14

On April 19, 2010, plaintiff presented to Dr. Moore-Connelley for a Pap smear.   She said she was gradually improving, but she still had bad days when she was exhausted and sore from doing too much.   She was attending physical therapy regularly.   No objective abnormalities were noted.  (Tr. 1366-1367).

In June, 2010, plaintiff told Dr. Moore-Connelley that she was having right hand paresthesias in the first and third fingers on her right hand, gradually worsening over the last month.   The assessment was numbness of the right hand, consistent with ulnar nerve neuropathy. (Tr. 1359).

On June 21, 2010, electromyography and nerve conduction studies showed moderately severe right carpal tunnel syndrome, mild left carpal tunnel syndrome, no ulnar neuropathy and no cervical radiculopathy.   (Tr. 1257-1258).

In August, 2010, Dr. Moore-Connelley referred Ms. Allen to Dr. Steven Young at the Orthopedic Institute of Southern Illinois for right carpal tunnel syndrome.   (Tr. 1061).   She was seen on September 23, 2010, by a physician's assistant.   On exam, she had a full range of motion of both elbows and wrists.   She was able to make a fist of both hands and to extend the fingers past neutral.   She had positive Tinel's and positive median nerve compression tests bilaterally.   Ms. Allen stated that she did not want any type of surgery, and she requested occupational therapy. Dr. Young ordered therapy.   (Tr. 1053-1055).   Plaintiff returned on November 9, 2010.   She had been going to therapy and wearing splints.   She was "much, much better."   Her pain level and her numbness and tingling had decreased.   She again stated that she wanted to hold off on any type of surgery.   She was to continue with therapy and splints.   (Tr. 1052).

15

Ms. Allen began seeing Dr. Fah Che Leong, a specialist in urogynecolgy, on August 18, 2010, for problems associated with pain, prolapse and incontinence.   She said she had stress incontinence and urge incontinence.   She had loss of drops of urine with coughing, sneezing or laughing for 20 years, but it had gotten worse.   She also had "loss of unformed stool without her control."   On exam, post-void residual was 150 ml., and the supine empty stress test was negative. Kegel strength was 1/5.   The impression was significant myofascial pain, incomplete bladder emptying, mixed incontinence, cystocele and vaginal vault prolapse.   Dr. Leong noted that "her prolapse is not her biggest problem."   He also noted that she was "doing a lot of lifting and work remodeling her house, and that would make things worse."   (Tr. 1307-1309).   In March, 2011, Dr. Leong noted that she was at least 50% better.   The goal was for her to be 75% better before he would try a pessary or "even consider repair of the prolapse."   Her incontinence was less of a problem, but he noted that "this changes from time to time."   (Tr. 1291).   In June, 2011, she was about 70% better and wanted to hold off on surgery.   She was caring for a granddaughter two nights a week and was uncomfortable on the third day.   There was no mention of incontinence. She was to return in a year.   (Tr. 1284).   In October, 2012, her fibromyalgia pain was worse. She was still taking care of and lifting a grandchild.   On exam, her pelvic floor muscles were not as tender.   Kegel strength was again 1/5.   There was no mention of incontinence.   (Tr. 1274).

4.    **Medical Opinions**

On February 12, 2009, a physical therapist performed a Fit-for-Work evaluation.   The therapist concluded that Ms. Allen tested within the light physical demand level, but she had problems with poor endurance.   She was said to be capable of occasional handling and fingering. On the pegboard test, she scored 13 pegs in 30 seconds.   She complained of numbness in the left

forearm.   There were no complaints related to her right arm or hand.   (Tr. 737-739).

Dr. Moore-Connelly completed a form entitled Physical Medical Source Statement on May 26, 2009.   She had first seen plaintiff on March 31, 2009.   Her diagnoses were chronic pain, chronic weakness and vitamin D deficiency.   She opined that plaintiff was unable to maintain the persistence and pace to engage in competitive employment.   (Tr. 561-566).

On March 30, 2010, a physical therapist performed a second Fit-for-Work evaluation. The conclusions were similar to the conclusions on the first evaluation.   Plaintiff reported some numbness and tingling in her right leg and right arm.   (Tr. 700-702).

Physical therapist Nancy Webb wrote a letter in June, 2013, in which she summarized her treatment of plaintiff and stated that her "ability to tolerate activities related to employment is diminished.   (Tr. 1050-1051).

<u>**Analysis**</u>

Ms. Allen applied for DIB only.   In a DIB case, a claimant must establish that she was disabled as of her date last insured.   *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).   It is not sufficient to show that the impairment was present as of the date last insured; rather plaintiff must show that the impairment was severe enough to be disabling as of the relevant date. *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011).   Plaintiff was insured for DIB only through March 31, 2010.       Medical evidence after that date may be relevant to the question of whether she was disabled during the insured period.   *Bjornson v. Astrue*, 671 F.3d 640, 642 (7th Cir. 2012).

Because all of plaintiff's points rely to some degree on her own credibility, the Court turns first to her challenge to the ALJ's credibility determination.   Plaintiff argues that the credibility

17

determination was erroneous because the ALJ did not set forth exactly what he found not credible, he relied on his own interpretation of the medical evidence and dismissed reported symptoms based on his interpretation, he drew a negative inference from a lack of treatment without considering the underlying reason, and he cited inconsistencies that were not truly inconsistent.

The Court must use an "extremely deferential" standard in reviewing an ALJ's credibility finding. *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). The Court cannot reweigh the facts or reconsider the evidence, and can upset the ALJ's finding only if it is "patently wrong." *Ibid*. Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, 1996 WL 374186, at *3. While plaintiff's claims cannot be rejected *solely* because they are not supported by objective evidence, 20 C.F.R. §404.1529(c)(2), the ALJ may take that fact into consideration, since "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

Here, ALJ Janney gave a number of reasons for his adverse credibility finding. He cited numerous instances of conflict between the medical records and plaintiff's claims. For instance,

he pointed out that the records did not substantiate her claim that she had significant urinary incontinence during her pregnancy, and the records documented that she denied any bladder or bowel dysfunction in January, 2007, had no urgency or incontinence in December, 2007, and she told Dr. Khan in August, 2008, that she had rarely leaked urine and had no voiding or defecatory dysfunction.   It was not until August, 2008, that she requested nonnarcotic medications for pelvic pain, and by October, 2008, was using only over-the-counter pain medication.  (Tr. 784).  He took note of her daily activities such as caring for a young child, doing light housework, and doing a lot of lifting while helping to remodel her home.  She testified that she could only stand for 20 minutes, but medical record reflected that she complained of knee swelling after standing for an hour.   She testified that she did not have carpal tunnel surgery because the doctor recommended against it, but the records reflected that it was plaintiff who chose not have surgery.   The ALJ considered the course of her treatment and the fact that she improved with physical therapy and did not undergo surgery for carpal tunnel or bladder prolapse.   He also noted that the medical records did not reflect complaints about significant side effects from her medications.   (Tr. 783-789).

Citing *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010), plaintiff faults the ALJ for saying that plaintiff's statements are "not entirely credible."   This fact is not determinative of plaintiff's point.   "[T]he simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination."   *Pepper v. Colvin*, 712 F.3d 351, 367-368 (7th Cir. 2013), and cases cited therein.   Here, the ALJ set forth a detailed discussion of plaintiff's credibility in light of the evidence.   And, contrary to plaintiff's suggestion, "an ALJ's credibility findings need not specify which statements were not credible."   *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir.

19

2012).

The rest of plaintiffs' challenges to the credibility determination are no more than nit-picking based on a mischaracterization of the ALJ's decision. She asserts that the ALJ focused on the medical records in deciding whether to believe her claim. However there is nothing improper about pointing out that the claims made by Ms. Allen conflict with what she told her healthcare providers. *Getch,* 539 F.3d at 483. Her argument that the ALJ drew a negative inference from her treatment course without considering the underlying reason is factually incorrect. The ALJ did not, as she suggests in a footnote, draw a negative inference from her request for nonnarcotic pain medication. He did conclude that her choice not to have carpal tunnel surgery undercut her claim of disabling upper extremity pain, but the record reflects that she had health insurance throughout the period in issue. Therefore, her citation to *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014), is not applicable. And, her complaint that there was no actual inconsistency between her claim that she was unable to stand for more than 20 minutes and her statement that her knee swelled when she stood for more than an hour is simply incorrect.

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). ALJ Janney's analysis is far from patently wrong. It is evident that he considered the appropriate factors and built the required logical bridge from the evidence to his conclusions about plaintiff's testimony. *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010).

Plaintiff's third point, that the RFC analysis was erroneous because the ALJ did not properly assess her symptoms, relies entirely on the credibility of her own statements about needing to lie down during the day and her urinary and bowel limitations. The above discussion

20

of the credibility determination disposes of this point as well.

Ms. Allen also argues that the RFC assessment is not supported by substantial evidence because the ALJ created an "evidentiary deficit" by rejecting all of the medical opinions and then relying on his own independent medical determination to decide that she could frequently handle and finger with her upper extremities.   She cites *Suide v. Astrue*, 371 F. Appx. 684 (7th Cir. 2010) in support.

*Suide* does not stand for the proposition that an ALJ's RFC assessment must rest upon a healthcare provider's opinion.   The rule is, in fact, to the contrary.   The ALJ "must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians."   *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007).   The determination of RFC is an administrative finding that is reserved to the Commissioner.   20 C.F.R. §404.1527(d)(2).   The error in *Suide* was not that the ALJ did not rely on a doctor's opinion to assess RFC; rather, the error was that the ALJ failed to discuss significant medical evidence in the record.   *Suide*, 371 Fed.Appx. at 690.

Plaintiff also argues that the ALJ made his own independent medical assessment of her ability to handle and finger, and failed to build the required "logical bridge" between the evidence and his conclusion.   Although it is a close question, the Court concludes that she is correct.

The question is a close one because of the timing of the diagnosis of carpal tunnel syndrome relative to the date last insured.   As the ALJ noted, plaintiff made no complaints related to carpal tunnel when she was examined in October, 2008.   (Tr. 784).   However, she complained of hand pain in May, 2009, and x-rays showed grade 2 osteoarthritis in the DIP joint of the index fingers and of the first carpal-metacarpal compartments.   (Tr. 785).   A nerve conduction study in

July, 2009, before the date last insured, showed moderate carpal tunnel syndrome on the right and mild carpal tunnel syndrome on the left.   After her date last insured, another study showed moderately severe carpal tunnel syndrome on the right, mild carpal tunnel syndrome on the left, and no ulnar neuropathy.   In September, 2010, she reported that she had gradually noticed the onset of carpal tunnel symptoms over the past year.   She elected not to have surgery, and reported that she was much better in November, 2010.    (Tr. 786).

The ALJ did not explain the basis for his conclusion that Ms. Allen was limited to frequent handling and fingering, as opposed to occasional handling and fingering.   The agency defines occasional as "occurring from very little up to one-third of the time." Frequent is defined as "occurring from one-third to two-thirds of the time."    SSR 83-10, 1983 WL 31251, *5-6.

The Commissioner argues that the ALJ "reasonably added manipulative limitations based on the 'evidence of right upper extremity limitation.'"   Doc. 28, p. 7.   However, this argument does not answer plaintiff's point, which is that the ALJ did not explain why he believed that a limitation to frequent, rather than occasional, use of the arms was appropriate.   It is true that the ALJ summarized the medical records with respect to plaintiff's upper extremity complaints, but he did not explain how this evidence supported the limitation that he assessed.   This was error.   See, *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011)("The ALJ needed to explain how she reached her conclusions about Scott's physical capabilities . . . .").

The difference between frequent and occasional use of the arms is crucial in this case because Ms. Allen is limited to sedentary work.   "Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.   Any significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will

22

result in a significant erosion of the unskilled sedentary occupational base."   SSR 96-9P, 1996 WL 374185, p. 8.   At the hearing, ALJ Janney acknowledged that sedentary work requires good bilateral manual dexterity and, if plaintiff were limited to only frequent handling and fingering, she would be deemed to be disabled.   See, Tr. 848.

In addition, plaintiff argues that the ALJ ignored evidence of a tremor in her right hand. The record reflects that she complained of a tremor once, on January 11, 2010.   (Tr. 1265).   The ALJ noted this evidence at Tr. 787, and also noted that physical therapy records from the next month indicated strength of 4/5 in the upper extremities and, in March, 2010, she reported improved balance, decreased pain and that she was tolerating her activities.   The ALJ never explained how he viewed the significance of this evidence.   Evidence that she had 4/5 strength, improved balance, decreased pain and was tolerating activities does not negate the presence of a tremor.   He did not explain whether he believed that plaintiff had a tremor (or thought it was a transitory tremor that did not recur) and did not explain how the evidence of a tremor did or did not affect her ability to use her right hand.   This was error.   *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).

Plaintiff also argues that the ALJ failed to account for her urinary incontinence.   However, as was discussed in connection with the challenge to the credibility determination, the ALJ extensively considered the medical evidence relating to plaintiff's alleged incontinence, and adequately explained why he discredited her claim.   Citing to Tr. 1307, plaintiff refers to her worsening stress incontinence.   However, that medical record is dated August 18, 2010, almost 5 months after her date last insured.   The record supports the ALJ's determination that she did not experience work limitations from incontinence before her date last insured.

23

Lastly, plaintiff challenges the ALJ's weighing of the opinions of Dr. Moore-Connelly and the physical therapists.   As this case must be remanded because of the above errors, the Court will not discuss this point in any detail.   It is worth noting, however, that Dr. Moore-Connelley's opinion was rendered in May, 2009, shortly after she began seeing plaintiff.   On remand, the parties should consider obtaining an updated report which speaks to plaintiff's condition as of her date last insured.

Because of the ALJ's errors in determining RFC, this case must be remanded.   "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."   *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012), citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).   See also, *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) ("[A] a denial of benefits cannot be sustained where an ALJ failed to articulate the bases of his assessment of a claimant's impairment.")

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Allen was disabled during the relevant period or that she should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Cynthia L. Allen's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATED:**   7/29/2015

*s/J. Phil Gilbert*
**J. PHIL GILBERT**
**DISTRICT JUDGE**
